IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) No. 23 CR 113 |
| | ) |
| JONAS CASTILLO. | ) Judge Virginia M. Kendall |
| | ) |

**MEMORANDUM OPINION AND ORDER**

Jonas Castillo, a convicted felon, is charged with possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Castillo moves to dismiss the indictment, arguing that the charges against him violate the Second Amendment. (Dkt. 458). For the following reasons, the Court denies Castillo's Motion [458].

**BACKGROUND**

The Court takes the following facts from the government's Response to Castillo's motion. (Dkt. 478). On June 21, 2022, Castillo was allegedly driving with his then-girlfriend Karina Jiminez, when he got into a traffic altercation with another driver. During the incident, Castillo pointed a firearm at the other driver. The other driver called 911, and Chicago Police Department Officers came to the scene. Though Castillo attempted to evade the officers, officers apprehended Castillo after he fled on foot. Officers searched his abandoned vehicle and found a loaded semiautomatic firearm, with one round in the chamber.

At the time of his arrest, because of a criminal record which included two 2013 convictions for armed robbery, Castillo was prohibited from possessing a firearm under § 922(g)(1)[1]. Before

---

[1] Section 922(g)(1) concerns any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." Here, the Court refers to such individuals as "felons."

1

his arrest, Castillo had been on pretrial release on a firearm felony charge in DuPage County, Illinois. In this case, among other charges, Castillo is charged in Count 23 of the superseding indictment with one count of unlawful possession of a firearm by a felon, in violation of § 922(g)(1)—relating to Castillo's alleged unlawful possession of a firearm on June 21, 2022.

On October 13, 2024, Castillo filed a motion to dismiss Count 23 of the Superseding Indictment on Second Amendment grounds, challenging § 922(g)(1) facially and as applied to him. (Dkt. 458). Castillo acknowledges that this Court has rejected such challenges in other cases but filed his motion to preserve his Second Amendment arguments for appeal. (Dkt. 458 at 2–3); *see also United States v. McKay*, No. 23 CR 443, 2024 U.S. Dist. LEXIS 74577 at *2 (N.D. Ill. April 24, 2024) (Kendall, C. J.).

## LEGAL STANDARD

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits," Fed. R. Crim. P. 12(b)(1), such as a constitutional violation. *United States v. Holloway*, 74 F.3d 249, 253 (11th Cir. 1996). When considering a motion to dismiss a criminal indictment, the Court assumes all facts are true and views them in the light most favorable to the government. *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010) (per curiam) ("An indictment is reviewed on its face, regardless of the strength or weakness of the government's case.").

## DISCUSSION

Castillo claims that 18 U.S.C. § 922(g)(1) is unconstitutional facially and as applied to him. (Dkt. 458). First, the Court will briefly summarize Second Amendment jurisprudence, including the appropriate standard for evaluating constitutional challenges. Then, the Court will evaluate the merits of Castillo's claims.

2

I.  **Second Amendment Jurisprudence**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court recognized that the Second Amendment enshrines "the individual right to possess and carry weapons." 554 U.S. 570, 592 (2008). At the same time, "the right secured by the Second Amendment is not unlimited." *Id.* at 626. In particular, the Court explained that "nothing . . . should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. These laws enjoy a presumption of constitutionality. *Id.* at 627 n.26. Two years after *Heller*, in *McDonald v. City of Chicago*, the Court incorporated the Second Amendment right against the states with a similar emphasis on text and history. 561 U.S. 742 (2010) (quoting *Heller*, 554 U.S. at 599) ("[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day, and . . . is 'the *central component*' of the Second Amendment right.")

For a brief period, after *Heller* and *McDonald*, the lower courts used a two-step approach for analyzing Second Amendment challenges. *Ezell v. City of Chicago*, 846 F.3d 888, 892 (7th Cir. 2017). At step one—the "textual and historical" inquiry— the court asked, "whether the regulated activity [fell] within the scope of the Second Amendment." *Id.* If the conduct fell outside of the scope, the analysis ended. *Id.* If not, "then there [was] a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* (internal quotations omitted). The more severely the law burdened a person's Second Amendment right to possess a weapon for self-defense, the more exacting a court's means-end

scrutiny was. *See Wilson v. Cook County*, 937 F.3d 1028, 1032 (7th Cir. 2019). "By contrast, if a challenged law [did] not implicate a core Second Amendment right, or [did] not place a substantial burden on the Second Amendment right," the more lenient intermediate scrutiny applied. *Jackson v. City and County of San Francisco*, 746 F.3d 953, 961 (9th Cir. 2014).

In 2022, the Supreme Court rejected the two-step approach in *New York State Rifle & Pistol Association, Inc. v. Bruen*, holding that the two steps were "one step too many." 142 S. Ct. 2111, 2127 (2022). Instead, as the Court made clear, the appropriate inquiry begins with the text. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. If the conduct is presumptively protected, the government then has the burden to demonstrate that the challenged law is "consistent with this Nation's historical tradition of firearm regulation." *Id.* In other words, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

Most recently, in *United States v. Rahimi*, the Court clarified that its recent Second Amendment cases "were not meant to suggest a law trapped in amber," and that the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." 144 S. Ct. 1889, 1897–98 (2024). The *Rahimi* Court reaffirmed *Bruen*, explaining that if the Second Amendment's plain text covers an individual's conduct, a court must then consider "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id*. at 1898 (quoting *Bruen*, 142 S. Ct. at 2132). This requires the court to ascertain "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id*. "[C]entral to this inquiry" is "[w]hy and how the regulation burdens the right." *Id*.; *see also Bruen*, 597 U.S. at 29 ("*Heller* and *McDonald* point toward at least two metrics: how and why the

4

regulations burden a law-abiding citizen's right to armed self-defense"). Thus, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id*. Further, even "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster,'" so long as the law "comport[s] with the principles underlying the Second Amendment." *Id*. (quoting *Bruen*, 597 U.S. at 30); *see also id*. at 1925 (Barrett, J., concurring) (noting that "[t]o be consistent with historical limits, a challenged regulation need not be an updated model of a historical counterpart" and that "a test that demands overly specific analogues has serious problems").

Applying the *Bruen* test and following principles from *Rahimi*, the Court will now address whether Castillo's alleged conduct is covered under the plain text of the Second Amendment. If yes, the Court will then evaluate whether the government has met its burden to show that § 922(g)(1) is consistent with "this Nation's historical tradition of firearm regulation." *Rahimi*, 144 S. Ct. at 1896 (quoting *Bruen*, 142 S. Ct. at 2126).

**II.     18 U.S.C. § 922(g)(1)**

Castillo claims that 18 U.S.C. § 922(g)(1) is unconstitutional both facially and as applied to him. The Court has previously addressed the constitutionality of § 922(g)(1). *McKay*, 2024 U.S. Dist. LEXIS 74577 at *2. Because felons are not among "the people" protected by the Second

Amendment, and the Second Amendment has historically been understood as protecting law-abiding individuals, Castillo's claims both fail.

### a. Facial Challenge

#### 1. Plain Language

The "people" of the Second Amendment are not felons. U.S. Const. amend. II. *Heller* says as much. *See* 554 U.S. at 625. After examining the Second Amendment's text, history, and tradition, the Supreme Court concluded its protection only extends to "*law-abiding* citizens" using weapons "for lawful purposes," as the right to bear arms "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 625, 635 (emphasis added); *see also id.* at 635 ("[a]ssuming that [respondent] is not disqualified from the exercise of Second Amendment rights . . . ."). The qualification on who the "people" includes, exemplifies why "the right secured by the Second Amendment is not unlimited." *Id.* at 626. As such, "nothing . . . should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." 554 U.S. at 626; *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting) ("*Heller*'s reference endorses the proposition that the legislature can impose some categorical bans on the possession of firearms."); *cf. Heller*, 554 U.S. at 627 n.26 ("We identify these presumptively lawful regulatory measures only as examples . . . .").

While acknowledging that this Court has found that the Second Amendment's plain text does not cover felons, *McKay*, 2024 U.S. Dist. LEXIS 74577 at *11; *United States v. Dixon*, No. 22 CR 140, 2023 WL 2664076 (N.D. Ill. April 3, 2024), Castillo argues that the Court should follow other district court's, which have reached the opposite conclusion. *United States v. Head*, No. 23 CR 00450-1, 2024 WL 2292236, at *6 (N.D. Ill. May 21, 2024) (Maldonado, J.); *United States v. Gutierrez*, No. 1:22-CR-00329, 2024 WL 4041321, at *5 (N.D. Ill. Sept. 4, 2024) (Chang,

J.). Castillo argues that a "better interpretation of the phrase 'the people' as used in the Second Amendment is the one that comports with how the phrase is understood in other places in the Bill of Rights, including the First and Fourth Amendments." *Head*, 2024 WL 2292236, at *6; *see also Gutierrez*, 2024 WL 4041321, at *5. This understanding of the phrase leads to a conclusion, Castillo contends, that the Second Amendment covers felons. (Dkt. 458 at 4).

This interpretation of the Second Amendment, however, is difficult to reconcile with the guidance *Heller*, *Bruen*, and *Rahimi* provided on how best to interpret the term "the people." In his dissent in *Heller*, Justice Stevens explicitly notes that the majority "reads the Second Amendment to protect a 'subset' significantly narrower than the class of persons protected by the First and Fourth Amendments." 554 U.S. at 644. Likewise, in Justice Kavanaugh's concurrence in *Rahimi*, he also draws contrasts between the Second Amendment, which he characterizes as still in its "early innings, unlike the First, Fourth, and Sixth Amendments . . . ." 144 S. Ct. at 1923. Further demarcating the outer limits of the Constitution's gun protections,[2] *Bruen* repeated *Heller*'s conclusion that the Second Amendment applies only to law-abiding citizens over ten times. *See, e.g.*, *Bruen*, 142 S. Ct. at 2132–33 ("[w]hile we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a *law-abiding citizen's* right to armed self-defense.") (emphasis added). And in ruling for a group of applicants seeking gun licenses, the Court explained that such individuals fell within

---

[2] As the Court has noted previously, prior to *Bruen*, the Seventh Circuit's debate about § 922(g)(1)'s constitutionality centered on challenges from nonviolent felons. *See, e.g.*, *Williams*, 616 F.3d at 693 (7th Cir. 2010) ("[W]e recognize that § 922(g)(1) may be subject to an overbreadth challenge at some point because of its disqualification of all felons, including those who are non-violent…"). It never, though, suggested that violent felons have a constitutional right to own a gun. *Medina*, 913 F.3d at 160 ("Whether a certain crime removes one from the category of 'law-abiding and responsible,' in some cases, may be a close question . . . . Those who commit felonies, however, cannot profit from our recognition of such borderline cases." (cleaned up)).

"the people" contemplated by the Second Amendment because they were "ordinary, *law-abiding*, adult citizens." *Id.* at 2134 (emphasis added).

Even more damaging to Castillo's underlying claim, in *Bruen*, six Justices emphasized that certain firearms regulations—including prohibitions on felons' possession of firearms—remain constitutional. In his concurrence, Justice Alito explained that *Bruen* did not "disturb anything that [the Court] said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns." 597 U.S. at 72 (cleaned up). Justice Kavanaugh, joined by Chief Justice Roberts, echoed this sentiment. "[A]ll that we decide in this case is that the Second Amendment protects the right of *law-abiding people* to carry a gun outside the home for self-defense." *Id.* at 2159 (Kavanaugh, J., concurring) (emphasis added). The instruction from *Heller* then—that "nothing" casts doubt on longstanding prohibitions on the possession of firearms by felons—remains in effect. *Id.* (quoting *Heller*, 554 U.S. at 626). These discussions all point towards a conclusion that the Second Amendment *does not* cover convicted felons.

Likewise, the Seventh Circuit recently cast doubt that laws that prohibit felons from possessing firearms are unconstitutional. *United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024). Specifically, in *Gay*, the Court observed that the language in *Bruen* "is hard to square" with the argument that "the Second Amendment permits persons with felony convictions to possess both firearms and ammunition, notwithstanding statutes such as 18 U.S.C. § 922(g)(1)." *See Gay*, 98 F.4th at 846. The *Gay* Court wrote that the Supreme Court "pointedly stated that longstanding prohibitions on the possession of firearms by felons are valid." *Id*. (internal quotation marks omitted). *Gay* also noted that multiple Justices had written separately in *Bruen* to explain that the decision "did not change anything about *Heller*." *Id*. (first citing *Bruen*, 597 U.S. at 72 (Alito, J., concurring); and then citing *Bruen*, 597 U.S. at 80–81 (Kavanaugh J., concurring)). *Rahimi* made

8

the same point. *Rahimi*, 144 S. Ct. 1902 ("[O]ur opinion [in *Heller*] stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'"); see also *id*. at 1923 (Kavanaugh, J., concurring). The analysis in *Gay* is therefore entirely consistent with *Rahimi*.

Thus, while there is no binding precedent on whether the Second Amendment's plain text covers convicted felons' possession of firearms, caselaw from the Supreme Court and the Seventh Circuit, at least, suggests that the Amendment does not include such individuals. What's more, Castillo has not pointed to any precedent where the Supreme Court has indicated that a convicted felons' possession of firearms *is* covered by the Second Amendment. Accordingly, the plain text of the Second Amendment does not protect Castillo's conduct.

### 2. Historical Tradition

Even assuming, however, that the Second Amendment's plain text does cover Castillo, the government has still met its burden in showing that § 922(g)(1) is consistent with "this Nation's historical tradition of firearm regulation" and does not violate the Second Amendment. *Bruen*, 142 S. Ct. at 2126. After *Bruen*, the Seventh Circuit clarified that a district court must engage in a "proper, fulsome analysis of the historical tradition supporting § 922(g)(1)" to determine if "modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is justified." *Atkinson v. Garland*, 70 F.4th 1018, 1021–22 (7th Cir. 2023) (quoting *Bruen*, 142 S. Ct. at 2133). Here, this means that the government must present historical analogues to show there is a tradition of limiting the right to keep and bear arms that is aligned with § 922(g)(1).

Section 922(g)(1) makes it unlawful for any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to "possess any firearm or

9

ammunition." The government analogizes § 922(g)(1) with two types of historical laws: (i) laws that categorically disqualified groups who were untrustworthy adherents to the law from possessing firearms and (ii) laws that authorized capital punishment and estate forfeiture for felonies. (Dkt. 478 at 20–21). Because the government has met its burden of demonstrating showing that § 922(g)(1) is consistent with "this Nation's historical tradition of firearm regulation" even if the Second Amendment's plain text did cover felons like Castillo, the statute would still not violate the Second Amendment.

Laws prohibiting untrustworthy individuals from possessing firearms have existed since at least late 17th-century England. *Bruen*, 142 S. Ct. at 2127. The government points out, for example, how in 1689, the English government passed a law disarming Catholics who refused to make declarations renouncing their faith. 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71–73 (1688); (Dkt. 478 at 21). This law was based on a theory that Catholics were disobedient of the sovereign, not that they were necessarily dangerous. *Range v. Attorney Gen. of the U.S.*, 69 F.4th 96, 121–22 (3d Cir. 2023) (Krause, J., dissenting) (explaining that disarmament laws were "based on the notion that every single Catholic was dangerous" but rather "the disarmament of Catholics in 1689 reflects Protestant fears that Catholics could not be trusted to obey the law."). The government also cites other laws in which untrustworthiness, as opposed to demonstrated danger, served as a basis for disarming a person. (*See* Dkt. 478 at 22); *United States v. Jackson*, 110 F.4th 1120 (8th Cir. 2024). Further, in 18th century England, one "arousing 'suspicion of an intention to commit any act of violence or disturbance of the peace'" was often prohibited from possessing a firearm. C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 716 (2009).

The government points out that Colonial Americans then continued the English tradition of disarming those "perceived as dangerous." (Dkt. 478 at 23–26); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arm*, 20 Wyo. L. Rev. 249, 262 (2020). "Like English laws, colonial laws were sometimes discriminatory and overbroad—but even those were intended to prevent danger." *Id.* As the government explains, the Continental Congress recommended, in 1776, that colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. (Dkt. 478 at 26); *4 Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). Similarly, § 922(g)(1) addresses a "general societal problem that has persisted since the 18th century" in that the statute categorically disarms untrustworthy individuals—namely, felons. *See Atkinson*, 70 F.4th at 1023. Accordingly, the government has demonstrated a history and tradition of disarming untrustworthy people in this country.

Next, the government also provides support that, historically, laws went much further than § 922(g)(1)—by authorizing capital punishment and estate forfeiture for felons. (Dkt. 478 at 29). Before the founding, the standard penalty for a felony was death. *See* 4 William Blackstone, *Commentaries on the Laws of England* 98 (1769). Additionally, the government points out that upon conviction a felon's estate would escheat to the state, and he would be required to forfeit all his goods and chattels—including his arms. *Id.* at 379–82. Similarly, in early America "death was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) (citation omitted). This also explains why disarmament laws were not even more prevalent. *Range*, 69 F.4th at 126-27 (Krause, J., dissenting) ("[T]he ubiquity of the

11

death penalty suggests that the Founding generation would have had no objection to imposing on felons the comparatively lenient penalty of disarmament.").

The *Rahimi* Court highlighted the throughline between historical laws punishing felonies with death or estate forfeiture and modern laws that prohibit felons from possessing arms. The Court wrote that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791" and that "a challenged regulation [need] not precisely match its historical precursors" to be constitutional. 144 S. Ct. at 1897–98 (cleaned up). In this vein, the Court elaborated, "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." 144 S. Ct. at 1902. Thus, the capital punishment and estate forfeiture laws for felons are "relevantly similar" to § 922(g)(1). *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 142 S. Ct. at 2132).

Castillo cites to *United States v. Prince*, 700 F.Supp.3d 663, 669-676 (N.D. Ill. 2023) and *United States v. Neal*, 715 F. Supp. 3d 1084, 1096 (N.D. Ill. 2024)—cases in which district courts found that § 922(g)(1) was not consistent with the nation's historical tradition. (Dkt. 458 at 6). Neither case is binding on the Court. As for *Prince*, as this Court has said, that holding merely "shows that reasonable minds can, and have, disagreed on how to approach *Bruen's* historical traditions analysis." *McKay*, No. 23 CR 443 at *4 (Kendall, C. J.). The same is true for *Neal*.

While the English and colonial laws discussed above may not perfectly align with § 922(g)(1), they are sufficiently analogous with § 922(g)(1) to show the statute is consistent with the nation's history and tradition. And further, *Bruen* only "requires only that the government identify a well-established and representative historical analogue, not a historical twin." 142 S. Ct. at 2133. The government surely has met this burden.

12

b. As Applied Challenge

Separately, Castillo claims that § 922(g)(1) is unconstitutional as applied to him because Castillo claims that he is not a risk to public safety. (Dkt. 458 at 7–8). Castillo's as-applied challenge also fails for various reasons.

Besides the fact that the Seventh Circuit has never upheld an as-applied Second Amendment challenge to § 922(g)(1), Castillo also does not offer any support for his proposition that the statute's constitutionality turns on individualized assessments. In *Atkinson*, the Seventh Circuit explained that if a defendant calls for a distinction between violent and non-violent crimes under § 922(g)(1), the defendant must present historical evidence to justify a different outcome. 70 F.4th at 1024. Castillo has not presented any historical evidence to support such an individualized assessment or a carveout for non-violent felonies. *See id.* at 1023 ("[Atkinson] does not provide much historical basis for individualized assessments or for delineating between individuals who committed violent versus non-violent crimes."). To the contrary, the historical evidence points to an opposite conclusion—laws in American colonies and 17th-century England suggest that felons, both violent and non-violent, were targeted for firearm dispossession. *See* discussion *supra* Part II.a.ii.

Even assuming that there was historical evidence to distinguish between violent and non-violent felons, Castillo's past crimes may still have been sufficient to find § 922(g)(1) constitutional as applied to Castillo. Castillo has multiple felony convictions for armed robbery. (Dkt. 478 at 40). There is evidence, as the government highlights, that the historical understanding of "dangerousness" included even potentially violent individuals, such as Castillo. (Dkt. 478 at 38); *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) (explaining that to prevent "dangerous" people

from possessing guns, "founding-era legislatures categorically disarmed groups whom they judged to be a *threat* to public safety.") (emphasis added); *United States v. Alaniz*, 69 F.4th 1124, 1130 (9th Cir. 2023) ("[t]he analogues show a longstanding tradition of enhancing a defendant's sentence for the increased risk of violence created by mere possession of a firearm during the commission of certain crimes"); *See also United States v. Carr*, 107 F.4th 636, 645-46 (7th Cir. 2024) (stating that "Illinois armed robbery is a crime of violence"). This suggests that even if Castillo presented evidence to support the notion that § 922(g)(1) constitutionality turns on individualized assessments, Castillo is the sort of individual that the statute constitutionally prevents from possessing a firearm.

Accordingly, because Castillo has not presented sufficient evidence and because he has a history of armed robbery, § 922(g)(1) as applied to Castillo does not violate the Second Amendment.

## CONCLUSION

For these reasons, Castillo's Motion to Dismiss [458] is denied.

_____
Virginia M. Kendall
United States District Judge

Date: January 14, 2025